IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO REGIONAL COUNCIL OF
CARPENTERS PENSION FUND,
*et al.*,

     Plaintiffs,

   v.

CARLSON CONSTRUCTORS CORP.,
*et al.*,

     Defendants.

No. 17-cv-04242
Judge Franklin U. Valderrama

## MEMORANDUM OPINION AND ORDER

Plaintiffs, the Chicago Regional Counsel of Carpenters Pension Fund (Pension

Fund), the Chicago Regional Council of Carpenters Welfare Fund (Welfare Fund), the

Chicago and Northeast Illinois Regional Counsel of Carpenters Apprentice and

Trainee Program (Trainee Fund), and the Labor/Management Union Carpentry

Cooperation Promotion Fund (Labor/Management Fund), and their respective

trustees (collectively, the Trust Fund), filed suit against Carlson Constructors Corp.

(Constructors), Carlson Brothers, Inc. (Brothers) and CB Industries, Inc. (Industries)

(collectively, the Companies) under the Employee Retirement Income Security Act of

1974 (ERISA), 29 U.S.C. § 1001, *et seq.* R. 22, Am. Compl.[1] The Trust Funds are multi-

employer funded benefit funds governed by federal law, and collect and manage

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

contributions from employers pursuant to collective bargaining agreements made between employers and the Chicago and Northeast Illinois District Council of Carpenters, successor of the Chicago District Council of Carpenters (the Union). The Trust Funds assert that all of the Companies are bound by the collective bargaining agreements with the Union based on the single-employer and alter-ego doctrines, and thus are all required to contribute to the Trust Funds based upon hours worked by employees and/or subcontractors. Before the Court are the parties' motions for summary judgment. R. 83, Pls.' Mot. Summ. J.; R. 101, Defs.' Cross-Mot. Summ. J.[2] For the reasons discussed below, Plaintiffs' Motion for Summary Judgment is granted. The Court finds that the contract between Brothers and the Union signed in 1994 (Brothers CBA) did not terminate until 2019. The Court also finds that Defendants are a single employer. Defendants' Cross-Motion is denied, although the Court finds that there is a question of material fact as to whether Plaintiffs are equitably estopped from enforcing the Brothers CBA.

## Background

The facts herein are undisputed unless otherwise specified. In deciding cross-motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). So, when the Court evaluates Plaintiffs' motion for summary judgment, Defendants

---

[2]Together, the briefs, Local Rule 56.1 statements and responses, and evidence filed in support, consist of more than 2,800 pages. A comprehensive opinion was necessary in light of the voluminous record.

get the benefit of reasonable inferences; conversely, when evaluating Defendants' motion, the Court gives Plaintiffs the benefit of the doubt. On summary judgment, the Court assumes the truth of the facts presented by the parties, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Plaintiffs are multi-employer funded benefit funds that provide pension, health, and other benefits to Union members and their families. R. 103, Defs.' Resp. PSOF ¶ 1.[3] Plaintiffs collect and manage fringe benefit contributions from employers bound by the Area Agreement with the Union. *Id.* ¶¶ 2–6.

Brothers was formed by brothers Mark Carlson (Mark) and Robb Carlson (Robb), who are each 50% owners. R. 103, Defs.' Resp. PSOF ¶¶ 14–15. Brothers is a general contractor/project manager for governmental and private sector construction projects. *Id.* ¶¶ 28–30, 32. Mark and Robb operated Brothers; Mark was responsible for business development and Robb oversaw work on the construction projects. *Id.* ¶¶ 76, 77. On August 25, 1994, Brothers signed an agreement with the Union (Brothers CBA). *Id.* ¶ 71. In 2000, Brothers and Plaintiffs reached a settlement

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact will be identified as follows: "R. 93, PSOF" for the public, redacted Plaintiffs' statement of facts ["R. 87 (Sealed), PSOF" for the unredacted version]; "R. 103, Defs.' Resp. PSOF" for the public, redacted Plaintiffs' response to the Defendants' statement of facts; "R. 107, DSOAF" for the public, redacted Defendants' statement of additional facts; ["R. 108 (Sealed), DSOAF" for the unredacted version]; "R. 117, Pls.' Resp. DSOAF" for the public, redacted Plaintiffs' Response to Defendants' statement of additional facts; "R. 105, DSOF" for the public, redacted Defendants' statement of facts in support of their motion for summary judgment ["R. 106 (Sealed), DSOF" for the unredacted version]; "R. 116 (Sealed), Pls.' Resp. DSOF" for the unredacted Plaintiffs' response to the Defendants' statement of facts [no redacted version was filed]; "R. 116 (Sealed), Pls.' SOAF" for the unredacted Plaintiffs' statement of additional facts [no redacted version was filed]; and "R. 121, Defs.' Resp. Pls.' SOAF" for the public, redacted Defendants' response to the Plaintiffs' statement of additional facts.

related to an audit conducted by Plaintiffs. R. 105, DSOF ¶ 15; *see also* R. 116 (Sealed), Pls.' Resp. DSOF ¶ 15. The recitals to the settlement agreement (drafted by Plaintiffs' prior counsel) stated that the Brothers CBA terminated on May 31, 1998." R. 105, DSOF ¶ 16 (citing R. 106-3 (Sealed) at 18 (Termination Recital)). After receiving additional documents from Brothers as part of the audit, Plaintiffs' auditor submitted a report dated September 22, 1999 that stated that the Brothers CBA terminated as of May 31, 1998. *Id.* ¶ 12 (citing R. 106-3 (Sealed) at 23 (Audit Report)). Plaintiffs requested to conduct audits of Brothers in 2002 and again in 2008. *Id.* ¶¶ 19, 25; *see also* R. 116 (Sealed), Pls.' Resp. ¶¶ 19, 25. Each time, Defendants informed Plaintiffs' auditor that the Brothers CBA had terminated, and never heard back from Plaintiffs or their auditors about pursuing the audits. R. 105, DSOF ¶¶ 20, 25; *see also* R. 116 (Sealed), Pls.' Resp. ¶¶ 20, 25. Brothers believed that it was not subject to the Area Agreement and had no obligation to submit to an audit by Plaintiffs. R. 105, DSOF ¶ 22. Plaintiffs' internal systems show that Brothers was bound by the Area Agreements, but that in 2002 and 2008 it was not performing work within the jurisdiction of the Union. R. 105, DSOF ¶¶ 12, 22, 25, 27; R. 116 (Sealed), PSOAF ¶¶ 3–4.

Mark and Robb formed Constructors in 2000 because they wanted to pursue projects that offered preferences to women-owned businesses. R. 103, Defs.' Resp. PSOF ¶¶ 19–20. On May 29, 2001, Constructors signed an agreement with the Union at Mark and Robb's direction. *Id.* ¶ 73. In the beginning, Mark and Robb decided to use Constructors as a payroll company for Brothers. *Id.* ¶ 24. In approximately 2011,

Constructors received its first project so Mark and Robb made the decision to have Industries begin acting as the payroll company for Constructors and Brothers. *Id.* Like Brothers, Constructors started operating as a general contractor/project manager for governmental and private sector construction projects. *Id.* ¶¶ 28–31. On paper, Mark's wife (Nancy Carlson (Nancy)) and Robb's wife (Laurel Carlson (Laurel)) each owned 50% of Constructors. *Id.* ¶ 20.

Although Nancy and Laurel were Constructors' president and secretary, respectively, for a period of time, it was Mark and Robb who controlled Constructors, with Mark responsible for business development and Robb responsible for overseeing work on the projects. R. 103, Defs.' Resp. PSOF ¶¶ 76, 80. When Mark and Robb had an interest in bidding on projects offering a preference to minority woman-owned businesses, they made Rosalia Turner (Defendants' Latina controller) the new president of Constructors. *Id.* ¶¶ 66, 79. From the time Constructors was formed until her deposition in 2019, no one reported to Laurel what Constructors was doing nor did she know who ran the day-to-day operations of the business. *Id.* ¶ 21. Laurel was given corporate resolutions to sign but had no understanding of what those documents were. *Id.* ¶ 22. Likewise, Nancy had no control over Constructors; instead, she performed the same bookkeeping-type work for Constructors that she performed for Brothers. *Id.* ¶ 25. Robb acquired Nancy's 50% interest in Constructors in 2015. *Id.* ¶ 20. Robb supervised Defendants' project managers regardless of whether the project was contracted for Brothers or Constructors, and Mark bid on projects for both Brothers and Constructors. *Id.* ¶ 80. Mark decided whether a project would become a

"Brothers project" or a "Constructors project." *Id.* Mark and Robb were also responsible for hiring and firing employees such as project managers and the Companies' controller. *Id.* ¶¶ 66, 74. However, site superintendents and quality supervisors hired employees for various projects. R. 117, Pls.' Resp. DSOAF ¶ 22.

Mark and Robb formed Industries in 1998. Although Industries was originally formed to act as a general contractor, Industries became the captive payroll company for Brothers and Constructors in 2011. R. 103, Defs.' Resp. PSOF ¶¶ 17, 18. Since that time, the hours worked by the project managers, superintendents, comptroller, and the other employees who performed work for Constructors and Brothers were reported to Industries, which then issued payroll checks to Defendants' employees. *Id.* ¶¶ 62, 63.

Defendants use a common website (www.carlson-construction.net) to market themselves. R. 103, Defs.' Resp. PSOF ¶¶ 28–33. Defendants work out of the same office space, have a shared in-house controller, and work with a shared receptionist. *Id.* ¶¶ 54, 63, 66. Defendants also share the same computers, server, and cell phone plan, and the employees use the same vehicles regardless of whether the project is through Constructors or Brothers. *Id.* ¶¶ 26, 55. Defendants had combined financial statements, were all borrowers on the same loan agreements, and maintained a common line of credit. *Id.* ¶¶ 56–58, 70. Mark, Robb and Nancy were authorized signors on the accounts for Brothers, Constructors, and Industries. *Id.* ¶ 49. Defendants were all insured and bonded through common insurance policies. *See id.* ¶ 38. Finally, the Companies all had common professional service providers,

(including shared registered agents, shared attorneys, shared accountants, shared insurance brokers), and the Companies banked at the same banks. *Id.* ¶¶ 37, 47, 65, 67.

Plaintiffs completed an audit of Defendants for the period July 1, 2014 through December 31, 2017 (the Audit Period). R. 103, Defs.' Resp. PSOF ¶¶ 5–9, 12, 13 Plaintiffs now seek to hold all Defendants liable for allegedly breaching the Area Agreement by subcontracting bargaining unit work to non-union subcontractors. *Id.*

In 2014, Constructors bid its last job, located at Ft. McCoy in Wisconsin (Ft. McCoy Project). R. 117, Pls.' Resp. DSOAF ¶ 5. By September 2014, Constructors' only active project was the Ft. McCoy Project. *Id.* ¶ 9. Around July 3, 2017, Constructors received the substantial completion notification from the government. *Id.* Thereafter, Constructors completed a few unfinished items and 14 hours of warranty work. *Id.* Neither Constructors nor Brothers employed bargaining unit personnel during the Audit Period. R. 105, DSOF ¶ 40; *see also* R. 116 (Sealed), Pls.' Resp. DSOF ¶ 40.

## Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party

must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

## Analysis

ERISA was enacted "to protect employee pension plans from underfunding." *Loc. 705 Int'l Bhd. of Teamsters Pension Fund v. Gradei's Express Co.*, 2020 WL 1530737, at \*3 (N.D. Ill. Mar. 31, 2020) (citing *Cent. States. Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 803 (7th Cir. 1999)). As amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq.*, ERISA "requires an employer to make contributions to a multiemployer pension plan 'in accordance with the terms and conditions of such a plan.'" *Bd. of Trs. v. 6516 Ogden Ave, LLC*, 170 F. Supp. 3d 1179, 1182 (N.D. Ill. 2016) (quoting 29 U.S.C. § 1145). ERISA defines a multi-employer pension plan as a plan "(i) to which more than one employer is required to contribute, [and] (ii) which is maintained

pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer . . . ." 29 U.S.C.A. § 1002(37)(A).

## I.    Motion to Strike

When "a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts [(L.R. 56.1 Statement)], and copies of documents (and other materials) that demonstrate the existence of those facts." *ABC Acquisition Co., LLC v. AIP Prod. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1(a)). The L.R. 56.1 statement must cite to specific pages or paragraphs of the documents and materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)). Under Local Rule 56.1(b)(3), the nonmovant must counter with a response to the separate statement of facts, and either admit each fact, or, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. Local R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. Local R. 56.1(b)(3)(C). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.*; *see also Daniels v. Janca*, 2019 WL 2772525, at *1–2 (N.D. Ill. July 2, 2019). Similarly, "[i]f additional material facts are submitted by the opposing

9

party . . ., the moving party may submit a concise reply in the form prescribed in that section for a response." N.D. Ill. Local R 56.1(a). If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted. *Id.* District courts have discretion to enforce strict compliance with Local Rule 56.1's requirements. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *see also Hanover Ins. Co. v. House Call Physicians of Ill.*, 2016 WL 1588507, at *2 (N.D. Ill. Apr. 19, 2016) (collecting cases).

Defendants move to strike portions of Plaintiffs' Response to Defendants' Statement of Facts (R. 116) and of Plaintiffs' Response to Defendants' Statement of Additional Facts (R. 117), contending that Plaintiffs improperly engage in argument in violation of Local Rule 56.1. R. 122, Defs.' Reply at 2. Defendants are correct that "[l]egal arguments do not go in the separate statements of fact." *ABC Acquisition*, 2020 WL 4607247, at *7 (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[i]t is inappropriate to make legal arguments in a Rule 56.1 statement of facts"); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1017–18 (N.D. Ill. 2018)). True, some of Plaintiffs' Local Rule 56.1 statements and responses include legal arguments, as well as arguments about what inferences should be drawn from facts. But so too do some of Defendants' Local Rule 56.1 statements and responses. The Court will not consider the portions of the parties' Local Rule 56.1 submissions that make legal arguments and assert legal conclusions. *See Rivera*, 319 F. Supp. 3d at 1018 (collecting cases disregarding or affirming the decision to disregard argumentative statements of fact). But the Court declines to

10

strike the noncompliant paragraphs, "as doing so would in some cases throw out a properly supported assertion along with a legal argument or conclusion." *Id.* Rather, the Court will consider the properly supported factual assertion but disregards the portion of any factual statement that contains legal arguments or conclusions. *See id.* (citing *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012) (denying motion to strike portions of Local Rule 56.1 statements containing legal conclusions but disregarding conclusions); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771–72 (N.D. Ill. 2012) (same)). Where any such facts are material to the Court's analysis, the Court notes them within this Opinion.

Additionally, Defendants ask the Court to strike several of Plaintiffs' Statements of Additional Facts submitted in support of Plaintiffs' Response to Defendants' Summary Judgment Motion, arguing that they support Plaintiffs' *own* Summary Judgment Motion rather than their Response to Defendants' Motion. Defs.' Reply at 3–4. The Court agrees. Courts should not "deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020). Although Local Rule 56.1(b)(3)(C) allows the nonmovant to submit a statement of additional facts in opposition to a summary judgment motion, Local Rule 56.1 does not allow the movant to submit additional facts as part of their reply in support of their own motion. Doing so would deny the nonmovant the opportunity to respond to those additional facts. Although parsing which statements support a party's own motion versus its response can be

11

complicated when the parties cross-move for summary judgment, in this instance, it is clear that some of Plaintiffs' statements of additional facts are included and relied upon in support of their own motion, rather than in their response to Defendants' motion. *See* R. 118, Pls.' Resp. at 11, 15, 17–18, 20–21, 23 (citing R. 116 (Sealed), PSOAF ¶¶ 9–13, 18–20). The Court disregards any new material included in Plaintiffs' Statement of Additional Fact that supports Plaintiffs' Reply. *See ABC Acquisition*, 2020 WL 4607247, at *7 (citing *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009); *Physicians Healthsource*, 950 F.3d at 968 (7th Cir. 2020)).

Finally, Plaintiffs also take issue with Defendants' Local Rule 56.1 submissions. Specifically, Plaintiffs argue that the Court should deem admitted a number of Plaintiffs' Rule 56.1 Statements because Defendants "merely deny the statement of fact (or sometimes just a portion of it) without any supporting authority." Pls.' Resp. at 10. As discussed above, the Local Rules require the nonmovant to cite to record evidence when disputing any statement of fact. N.D. Ill. Local R. 56.1(b)(3)(B). As discussed above, courts in this District routinely deem facts admitted where the nonmovant fails to cite to admissible record evidence in support of the denial. *See Curtis*, 807 F.3d at 218–19 (affirming district court's discretion in deeming facts admitted where opposing party "failed to admit or deny facts and provided only boilerplate objections, such as 'relevance' . . . [and m]ost importantly, . . . failed to provide citation to any admissible evidence in support of his denials" in violation of Local Rule 56.1(b)(3)(B)); *see also Daniels*, 2019 WL 2772525, at *1–2 (N.D. Ill. July 2, 2019) (collecting Seventh Circuit cases affirming district

courts' discretion to deem statements admitted when nonmovant fails to comply with Local Rule 56.1(b)(3)(B)). Plaintiffs contend that the Court should deem admitted statements where Defendants cite not to record evidence, but rather to Defendants' Statement of Additional Facts (R. 107) or to its Statement of Facts in Support of Summary Judgment (R. 105) rather than to the record evidence. Pls.' Resp. at 10 n.5. The Court agrees with Plaintiffs. "Local Rule 56.1 requires citations to the record evidence rather than cross reference to a reference to a citation; using a cross reference saves counsel time but offloads on the court the burden of identifying what is factually disputed and whether the dispute is material." *Rivera*, 319 F. Supp. 3d at 1019 (citing *Schlessinger v. Chicago Hous. Auth.*, 130 F. Supp. 3d 1226, 1228 (N.D. Ill. 2015)). Therefore, to the extent either party disputes a statement of fact but fails to cite to record evidence (including where they include only a cross-reference to another Local Rule 56.1 filing), the Court disregards the denials and deems those statements admitted. Where any such facts are material to the Court's analysis, the Court notes them within this Opinion.

## II.    Plaintiffs' Motion: Brothers CBA

Plaintiffs argue that the Court should grant partial summary judgment in favor of Plaintiffs, finding that Brothers is bound by the CBA between it and the Union (Brothers CBA) because Brothers is a signatory to the Brothers CBA. R. 86, Pls.' Br. at 9 (citing R. 93, PSOF ¶ 71). Defendants counter that the Brothers CBA terminated on May 31, 1998, and therefore the Court must deny Plaintiffs' summary judgment motion. R. 110, Defs.' Resp. at 2 (citing R. 105, DSOF ¶¶ 9, 12–16).

Alternatively, Defendants argue that the doctrine of equitable estoppel warrants summary judgment in their favor as to Brothers. R. 101, Defs.' Mot. Summ. J. at 2.

### A. Termination of the CBA

It is undisputed that Brothers signed a CBA with the Union on August 25, 1994 (Brothers CBA). R. 103, Defs.' Resp. PSOF ¶ 71. However, the parties disagree as to whether the record evidence demonstrates that the CBA terminated in 1998 or in 2017. *See* Defs.' Resp. at 2; Pls.' Resp. at 2–3. The Court agrees with Plaintiffs that Defendants are barred from pursuing a 1998 termination defense because Defendants have failed to establish "incontestable evidence" in support of termination.

Termination of a contract is not presumed, so Defendants bear the burden of establishing that the CBA was terminated. *Cent. States, Se. & Sw. Areas Pension Fund v. Sara Lee Bakery Grp., Inc.*, 2010 WL 6614902, at *5 (N.D. Ill. July 12, 2010), *report and recommendation adopted sub nom. Cent. States v. Sara Lee Bakery Grp., Inc.*, 2011 WL 862040 (N.D. Ill. Mar. 10, 2011). What's more, as Plaintiffs correctly point out, Section 515 of ERISA limits an employer's contract defenses, and multiple courts in this District "have held that a contract termination defense is only available if the termination is incontestable, and when the evidence of termination is not definitive, § 515 of ERISA bars consideration of the termination defense." *Id.*; *Cent. States, Se. & Sw. Areas Pension Fund v. Kabbes Trucking Co.*, 2004 WL 2644515, at *18 (N.D. Ill. Nov. 18, 2004); *Chicago Dist. Council of Carpenters Pension Fund v. Royal Components, Inc.*, 1995 WL 470270, at *2 (N.D. Ill. Aug. 4, 1995); *see*

*also Carpenters Health & Welfare Trust v. Bla–Delco Const. Inc.*, 8 F.3d 1365, 1369 (9th Cir. 1993); *Residential Reroofers Loc. 30-B Health & Welfare Fund of Philadelphia & Vicinity v. A & B Metal & Roofing, Inc.*, 976 F. Supp. 341, 348 (E.D. Pa. 1997).

Moreover, Plaintiffs are also correct that pension trusts typically are not themselves parties to collective bargaining agreements but are rather third-party beneficiaries to such agreements. *Royal Components*, 1995 WL 470270, at *1 (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148 (7th Cir. 1989)). Usually, when there is a flaw in contract formation, a third-party beneficiary gets nothing, just like the parties. *Gerber Truck*, 870 F.2d at 1151. But "unlike most third-party beneficiaries, pension trusts do *not* take contracts as they find them." *Royal Components*, 1995 WL 470270, at *1 (citing *Gerber Truck*, 870 F.2d at 1151) (emphasis in original). Rather, in a trust fund action, "if the employer simply points to a defect in the formation of the contribution agreement—such as fraud in the inducement, illegality, oral promises to disregard the text, or *effective termination*—the employer *is still bound by its promise to the pension trusts*." *Id.* (emphasis in original); *see also Gerber Truck,* 870 F.2d at 1149) (a pension fund is entitled to "enforce the writing without regard to the understandings or defenses applicable to the original parties"). Contract defenses are restricted in trust fund collection actions because "millions of workers depend upon the employee benefit trust funds for their retirement security." *Royal Components*, 1995 WL 470270, at *1 (internal citations omitted). Allowing employers to avoid payments to pension plans

15

based on defects in the contract would "saddle the plans with unfunded obligations." *Gerber Truck,* 870 F.2d at 1153.

Here, Defendants argue that the CBA with Brothers terminated as of May 31, 1998. As noted above, Defendants can only pursue this defense if the termination is incontestable based on the contract. The Agreement, signed by Brothers and the Union on August 25, 1994, states:

> EMPLOYER and the UNION hereby agree to be bound by the Area Agreements negotiated between the Chicago and Northeast Illinois District Council of Carpenters and the various Employer Associations for the period beginning with the expiration date of the several Agreements referred to in numbered paragraph 3 thereof and ending on the expiration dates of any successor Agreements thereto from year to year thereafter unless the Employer gives written notice to the UNION of a desire to amend or terminate any such Agreements at least three calendar months prior to the expiration of such Agreement or Agreements.

R. 93 at 291 (Brothers CBA ¶ 4). Language like in paragraph 4 of the Brothers CBA (Termination Clause) "indicates that the contract will continue in effect from year to year after a specified earliest possible expiration date absent a written notice of termination [and] is known as an 'Evergreen Clause.'" *Kabbes Trucking*, 2004 WL 2644515, at *2; *see also* R. 116 (Sealed), Pls.' Resp. DSOF ¶ 13 (citing Conklin Dep. at 42:3–19 ("A company signs a contract with the union saying they're going to be signatory, and they'll remain a signatory until they give notice, and it has to be within a certain timeframe. And then they're saying they're going to be – they're going to agree to the area bargaining agreement until they do that. So area bargaining agreements can term and be renegotiated, but they're still going to be signatory under the next one until they decide to actually become non-signatory.")).

Brothers did not send written notice to the Union terminating the Brothers CBA, as required by the Termination Clause, until May 1, 2017. R. 93 at 499 (Brothers Termination Letter) (disputing that any CBA between Brothers and the Union was in effect and indicating that, to the extent Brothers continued to be a party to such agreement, it wished to terminate the CBA). But Defendants contend that documents provided to Brothers in 1999 from Plaintiffs' prior attorneys and auditor "at least raise the inference that the [Brothers CBA] was terminated" as of May 31, 1998. R. 103, Defs.' Resp. PSOF ¶ 71; Defs.' Resp. at 2 (citing R. 105, DSOF ¶¶ 9, 12–16).

Again, it is Defendants' burden to establish "incontestable evidence" in support of termination. *Sara Lee Bakery Group*, 2010 WL 6614902, at *5. Defendants' admission that their documentary evidence "raise[s] the inference" of termination in 1998 clearly does not constitute "incontestable evidence." R. 103, Defs.' Resp. PSOF ¶ 71. The Court accordingly finds that Defendants have not met their burden and could end the termination defense analysis here. However, for the sake of completeness, the Court more closely examines the evidence of termination on which Brothers' termination defense rests.

Defendants contend that two documents support termination of the Brothers CBA in 1998: (1) a September 22, 1999 report from Plaintiffs' auditor stating that, "[s]ince [Brothers'] agreement with the Trust Fund terminated as of May 31, 1998, [the auditor's] review ended as of that date." R. 105, DSOF ¶ 12 (citing R. 106-3 (Sealed) at 23 (Audit Report)); and (2) the recitals to the settlement agreement

drafted by Plaintiffs' prior counsel and signed by Robb and Plaintiffs, stating that Brothers "was signatory to a Collective Bargaining Agreement . . . with the Chicago and Northeast Illinois District Council of Carpenters [ ], which terminated on May 31, 1998." R. 105, DSOF ¶ 16 (citing R. 112-3 at 18 (Termination Recital)).

True, the language in both the Audit Report and Termination Recital is clear on its face. But neither document satisfies the clear prerequisite for termination set forth in the Brothers' CBA Termination Clause: *Brothers* must give written notice to the *Union* of its desire to terminate the CBA. R. 93 at 497. The Audit Report clearly does not constitute notice from Brothers, but rather the auditor's understanding of the status of the Brother CBA. The Seventh Circuit has held that a misunderstanding of a labor agreement's termination date by a *pension trust* is irrelevant when the contract language is clear, so a potential misunderstanding by the pension trust's *auditor* matters even less. *Kabbes Trucking*, 2004 WL 2644515, at *19 (citing *Illinois Conference of Teamsters Welfare Fund v. Mrowicki,* 44 F.3d 451, 459–60 (7th Cir. 1994)). And Brothers provides no documents that form the basis for the auditor's understanding.

Because Robb, acting as the employer, signed the Settlement Agreement, it arguably could be considered "written notice from the employer." However, the Settlement Agreement also does not save Defendants' termination argument. As Plaintiffs point out, recitals typically "will not, of themselves, be considered binding obligations on the parties or an effective part of their agreement unless referred to in the operative portion of their agreement." Pls.' Resp. at 3–4 (citing *First Bank & Tr.*

18

*Co. of Illinois v. Vill. of Orland Hills*, 787 N.E.2d 300, 308 (Ill. App. Ct. 2003)).[4] The Termination Recital is not incorporated into the substance of the Settlement Agreement. But even if the Termination Recital could be considered binding, the Settlement Agreement is between Brothers and the Plaintiff Funds, not the Union. And although it may be reasonable to infer that the Settlement Agreement was provided to the Union, Defendants do not present any evidence that Brothers sent the Settlement Agreement to the Union.

In short, neither the Audit Report nor the Termination Recital clearly satisfy the intent to terminate notice required by the Termination Clause of the Brothers CBA. And really, Defendants' arguments regarding termination are the sort that should be litigated between Brothers and the Union, rather than Brothers and Plaintiffs. *See, e.g.*, *Royal Components*, 1995 WL 470270, at *1. At bottom, a 1998 termination has not been clearly established, so Section 515 of ERISA bars Defendants' termination defense. The indisputable evidence establishes instead that Brothers terminated the Agreement on May 1, 2017, and that the termination became effective on May 31, 2019.[5]

---

[4]Defendants argue that ERISA preempts state law rules of interpretation and applies federal common law, which interprets agreements in an ordinary and popular sense as would a person of average intelligence. Defs.' Reply at 7 n.3 (citing *Phillips v. Lincoln Nat. Life Ins. Co.,* 978 F.2d 302, 307–08 (7th Cir. 1992)). But importantly, *Phillips* holds only that the Court must apply federal common law rules of contract interpretation when resolving ambiguities in "ERISA plans and insurance policies." *Id.* at 307. The Settlement Agreement between Plaintiffs and Defendants is neither.

[5]Although Brothers sent notice of termination to the Union on May 1, 2017, pursuant to the Termination Clause, once the employer sends notice, the CBA will terminate concurrently with the expiration of the accompanying Area Agreement. The relevant Area Agreement was

Alternatively, Defendants argue that the CBA is still not effective, because it lapsed between 1998 and the filing of Plaintiffs' Complaint. R. 110, Defs.' Resp. at 12–13. In support, Defendants cite *Chicago Dist. Council of Carpenters Pension Fund v. Hunter Alliance Corp.*, 1998 WL 155928, at \*3 (N. D. Ill. 1998)). In *Hunter*, Hunter Alliance Corporation (Hunter), the employer, executed an agreement in 1975 under which it agreed to be bound by the then-in-effect CBA between the union and the Mid-America Regional Bargaining Association (MARBA). *Id.* at \*1. The agreement, which contained an automatic renewal clause (also known as an "evergreen clause"), also obligated Hunter to make contributions to certain funds. *Id.* at \*2–3. Hunter made a number of payments to the funds at first, but stopped doing so in 1976 when it ceased operations. *Id.* at \*1. Neither the union nor the funds took any action against Hunter. Thirteen years later, the son of the original owner, a developer, decided to "resurrect" Hunter, unaware of the 1975 CBA. *Id.* When the union filed an unfair labor practice charge with the National Labor Relations Board (NLRB) against Hunter in 1994—claiming that Hunter had repudiated the 1975 agreement and unilaterally changed the terms and conditions of employment—the NLRB determined that the CBA had lapsed. *Id.* at \*2. The NLRB emphasized that such a result was warranted due to the absence of bargaining unit employees and the lack of communication between the parties during the 16-year period from 1976–1994. *Id.* at \*2–3. The district court likewise concluded that Hunter was not bound to the 1975 CBA. *Id.* at \*4. The court explained that the funds were attempting to revive an

in place for the period June 1, 2014 through May 31, 2019. R. 103, Defs.' Resp. PSOF ¶ 3; R. 93 at 497, 499.

agreement that at some point, in the absence of employee and operations, ceased to exist. *Id.* at *4.

"Generally, however, the Seventh Circuit routinely upholds the validity of automatic rollover clauses when the CBA includes clear termination clauses and the essential termination procedures have not been properly followed." *Vulcan Constr. Materials, LP v. Int'l Union No. 150*, 2009 WL 5251889, *7 (N.D. Ill. Nov. 25, 2009). *See, e.g., Office & Prof'l Employees Int'l Union, Local 95 v. Wood County Tel. Co.*, 408 F.3d 314, 315 (7th Cir. 2005) ("Allowing an agreement to persist is the point of an evergreen clause."); *Contempo Design, Inc. v. Chi. and Northeast Ill. Dist. Council of Carpenters*, 226 F.3d 535, 546 (7th Cir. 2000) (determining that a union and employer were bound to a CBA that included an automatic renewal clause because terms of the termination clause were not correctly followed, stating that "[t]he terms of a [CBA] are to be enforced strictly when they are unambiguous."); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Sara Lee Bakery Grp., Inc.,* 660 F. Supp. 2d 900, 917 (N.D. Ill. 2009) ("A contract containing an evergreen clause binds an employer to subsequent CBAs until the contract is properly terminated.").

*Hunter* is distinguishable from these cases because in *Hunter*, the employer ceased operations and did not have any employees for a significant amount of time. *Hunter Alliance Corp.*, 1998 WL 155928, at *3 ("[T]he cause of the lapse was rooted in the long absence of bargaining unit employees."). In the instant case, on the other hand, the record does not demonstrate that Brothers ceased operations for any period of time. Therefore, the automatic renewal clause of the Brothers CBA must be

"strictly construed," and thus, according to its terms, binding on Brothers until Brothers terminates the Brothers CBA. *Contempo Design*, 226 F.3d at 546. Accordingly, the Court finds that the Brothers CBA has not lapsed.

All in all, the Court finds (rejecting Defendants' 1998 termination defense) that the Brothers CBA did not terminate until 2019 and has not lapsed. Accordingly, the Court further finds that Brothers is bound by the Brothers CBA.

### III.    Plaintiffs' Motion: Single Employer and Alter Ego

The parties agree that Constructors agreed to be bound by the Union's Area Agreement in 2001 and was a party to that Agreement (Constructors CBA) until May 31, 2019. R. 103, Defs.' Resp. PSOF ¶¶ 3, 73; R. 116 (Sealed), Pls.' Resp. DSOF ¶ 4. Plaintiffs argue that Industries and Brothers are *also* bound to the Constructors CBA under the single-employer and/or alter-ego doctrines. Pls.' Br. at 9, 15.

### A.    Waiver as to Industries

Plaintiffs contend that Defendants have waived any argument that Industries is bound by the Constructors CBA under the single-employer or alter-ego theories by failing to address Industries in their Response. Pls.' Resp. at 2. The Court agrees. Defendants' Response not only fails to argue why Industries is not bound to the Constructors CBA, but also specifies throughout that "[t]he dispute is whether th[e Constructors] CBA applied to Brothers." Defs.' Resp. at 1; *see also id.* at 4 (arguing that Brothers' lacked the intent to evade necessary for alter-ego theory); *id.* at 5–7 (appropriate timeframe for single-employer analysis is the period during which Brothers allegedly violated the Constructors CBA); *id.* at 7–12 (analyzing the single-

22

employer doctrine factors as they apply to Brothers). Because Defendants fail to respond to Plaintiffs' contention that Industries is bound to the Constructors CBA under the single-employer doctrine, Defendants have waived any such argument.[6] *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). What's more, Defendants do not dispute the facts relied upon by Plaintiffs to establish that Industries is bound to the Constructors CBA under the single-employer doctrine. *See generally* Pls.' Br.; R. 103, Defs.' Resp. PSOF ¶¶ 16, 18, 24–25, 27–32, 34–41, 43–44, 48–49, 54–58, 63–67, 69, 73; *see also* R. 107, Defs.' SOAF ¶¶ 25, 27, 28. Nor have Defendants presented facts in their Additional Statement of Facts that create a genuine dispute that a single-employer relationship existed between Industries and Constructors. *See generally* R. 107, DSOAF. Therefore, the Court grants summary judgment to Plaintiffs as to

---

[6]Only in their Reply in Support of Defendants' Motion for Summary Judgment do Defendants dispute whether Industries is bound to the Constructors' CBA via the single-employer doctrine. *See* Defs.' Reply at 2–3 n.2. But without leave of Court, Defendants cannot include argument that in fact constitutes a sur-response opposing Plaintiffs' Summary Judgment Motion in what is limited to a Reply in support of Defendants' Summary Judgment Motion. *See, e.g.*, *Physicians Healthsource*, 950 F.3d at 968. In fact, in the same Section, Defendants argue that Plaintiffs' Statements of Additional Fact which support Plaintiffs' own summary judgment motion rather than oppose Defendants' motion must be disregarded. Defs.' Reply at 2–4. As discussed above, the Court agrees with Defendants on that point. *See supra* Section I. The same principle limits Defendants' arguments here to those in support of their motion rather than in response to Plaintiffs' arguments. No matter, as Plaintiffs have met their burden of establishing that a single-employer relationship exists between Constructors and Industries. The facts supporting each single-employer factor are the same or similar to those that apply to Brothers and Constructors and are analyzed below. *See infra* Section III.B.3.

Industries, finding that the undisputed facts establish that Industries is subject to the Constructors CBA under the single-employer doctrine beginning in 2011.

### B.    Single Employer Analysis

Setting Industries aside, the Court now addresses whether Brothers is bound to the Constructors CBA under the single-employer and/or alter-ego doctrines. The Court begins with the single-employer analysis.

### 1.  Relevant Time Period

At the outset, the Court must determine whether it can consider facts outside of the limited time period during which Plaintiffs conducted an audit of Constructors, July 1, 2014 through December 31, 2017[7] (the Audit Period) when evaluating the single-employer relationship between Brothers and Constructors. Defendants contend that the Court is limited to facts underlying the relationship only during the Audit Period, which is the period Plaintiffs claim that Defendants violated the Area Agreements (for purposes of the single-employer analysis, via the Constructors CBA). Defs.' Resp. at 2, 5–7; *see also* Am. Compl. ¶ 1 (defining the Audit Period as July 1, 2014 through June 30, 2016). Plaintiffs, on the other hand, argue that they did not limit their claims regarding the single-employer relationship to the Audit Period, so

---

[7]Defendants contend that although the audit occurred between July 1, 2014 and December 31, 2017, because Constructors began winding down its business as of July 3, 2017, the relevant period for the Court to evaluate (in determining whether Brothers is bound to the Constructors CBA via the single-employer doctrine) is July 1, 2014 through July 3, 2017. Defs.' Resp. at 6–7. The Court separately analyzes this argument below. *See infra* Section III.B.2.

the Court should consider facts establishing the single-employer relationship as early as 2001, when Constructors signed the Constructors CBA. Pls.' Resp. at 10–12.

Plaintiffs claim that Defendants violated the Area Agreement by failing to comply with their obligations to contribute to the Trust Funds during the Audit Period by failing to pay amounts owed based upon the hours worked by employees and/or subcontractors performing work within the jurisdiction of the Union. *See* Am. Compl. ¶¶ 1, 36–37, 44–45, 52–53, 60–61 (defining the Audit Period as July 1, 2014 through June 30, 2016[8] and incorporating that time period into each Count claiming that Defendants breached the Area Agreement by failing to produce records to the auditors allowing them to determine whether Defendants complied with their contribution obligations to each plaintiff). But they dispute Defendants' contention that simply because their claims against Defendants are relegated to that time period means that the Court cannot consider facts preceding it to determine whether Defendants constitute a single employer. Pls.' Resp. at 10.

Both parties miss the mark and advance positions that are too extreme as to what the Court may or may not consider. The Court agrees with Defendants that the *most important* facts supporting a single-employer determination are those in existence at the time of the alleged violation. But as Plaintiffs argue—and Defendants

---

[8]Although the Amended Complaint alleges that the Audit Period ended as of June 2016, the undisputed evidence submitted by the parties establishes that the Audit Period ended on December 31, 2017, and the parties accept that date in their briefs. *See* Pls.' Br. at 9; Defs.' Resp. at 6; R. 103, Defs.' Resp. PSOF ¶ 9; R. 113-1 at 6, Decl. of R. Carlson ¶ 18. As such, the Court considers the Audit Period to have ended on December 30, 2017. (As discussed herein, the parties dispute whether the Court should consider the period between July 3, 2017 and December 30, 2017 when determining whether a single-employer relationship existed.)

in fact concede—facts predating the period of alleged violations are relevant "to the extent that [they] cast light on the[ entities'] subsequent relationship" during the relevant period. Pls.' Resp. at 11; Defs.' Resp. at 5–6 (both citing *Cimato Bros., Inc. & Cimato Bros. Constr., Inc. & Int'l Union of Operating Engineers, Loc. Union No. 17*, 352 NLRB 797, 799 (2008)). *Cimato Bros.* offers an example of this principle.

In *Cimato Bros.*, the National Labor Relations Board (NLRB) overturned the administrative law judge's finding that two companies were a simple employer, and in so doing, stated that "[t]he test for single-employer status therefore applies only to the relationship between the [entities] on and after [the date of the alleged violation of the CBA in effect]. . . ." 352 NLRB at 799 (citing *Richmond Convalescent Hospital, Inc.*, 313 NLRB 1247, 1249–50 (1994)). Plaintiffs argue that *Cimato Bros.* is distinguishable because in that case, the plaintiffs themselves "limited their claims to assert that the parties were a single employer only during a specific time period." Pls.' Resp. at 10–11.[9] But just like Plaintiffs here, the plaintiffs in *Cimato Bros.* alleged a violation of the CBA during a specific period but did not allege that the defendant entities were a single employer *only* during that limited period. *Cimato Bros.*, 352 NLRB at 801. In fact, the administrate law judge based his finding of a single-employer relationship in large part on facts that pre-dated the period of the alleged CBA violation. *Id.* at 802. Although the NLRB ultimately found that evidence insufficient to support a single-employer relationship between the entities, as

---

[9]Plaintiffs attempt to distinguish the cases cited by Defendants in support of limiting the evidence to be considered, but do not cite to any in support of their position that the Court should consider the entire course of parties' relationship, to the extent it is not relevant to the status of the relationship during the Audit Period.

discussed above, it held that "evidence of their prior relationship would be relevant only to the extent it cast light on their subsequent relationship." *Id.* at 799.

Another case cited by Defendants, *Chicago Reg'l Council of Carpenters Pension Fund v. United Carpet, Inc.*, 2020 WL 3077541, at *3 (N.D. Ill. June 10, 2020), supports this same principle. In *United Carpet*, the court looked to tax returns evidencing common ownership between two entities during the "relevant years" during which the alleged CBA violation occurred, but still looked to evidence presented about the parties relationship prior to the years in question—in the form of testimony from defendants and their accountant, as well as earlier tax returns—to the extent that evidence was relevant to the relationship between the parties during the period of the alleged violation. *Id.*

For purposes of this Opinion, then, the relevant period of the relationship between Brother and Constructors is the Audit Period, and evidence regarding their relationship during that timeframe will more directly support a finding for or against a single-employer relationship that forms the basis of Plaintiffs' claims against Brothers. But the Court will also consider evidence presented by the parties that pre-dates (but is still relevant to) the relationship during the Audit Period. Therefore, to the extent Defendants dispute statements of fact submitted by Plaintiffs *only* on the basis that the facts were outside of the relevant time period and those facts are supported by admissible and docketed evidence, the Court deems such statements

admitted.[10] *See Curtis*, 807 F.3d at 219 (affirming district court's discretion in deeming facts admitted where opposing party "failed to admit or deny facts and provided only boilerplate objections, such as 'relevance' . . . [and m]ost importantly, . . . failed to provide citation to any admissible evidence in support of his denials" in violation of Local Rule 56.1(b)(3)(B)).

## 2. Winding Down

Next, although the parties agree that the Audit Period is July 1, 2014 through December 31, 2017 (*see* Pls.' Br. at 9; Defs.' Resp. at 6; R. 103, Defs.' Resp. PSOF ¶ 9; R. 113-1 at 6, Decl. of R. Carlson ¶ 18), Defendants contend that the relevant time period to consider the single-employer relationship ended on July 3, 2017 because Constructors began "winding down" its business as of that date (Defs.' Resp. at 6–7 (citing R. 107, DSOAF ¶ 9)). The parties disagree about the meaning of the term "winding down," but the Court need not define it here. The parties do not dispute that on July 3, 2017, Constructors received a substantial completion notice from the government for the Fort McCoy Project, its only ongoing project. R. 117, Pls.' Resp. DSOAF ¶ 9. Nor is it disputed that after July 3, 2017, Constructors completed just a few unfinished items and about 14 hours of warranty work on the Fort McCoy Project. *Id.* Still, Constructors continued to exist as an entity into at least 2018, as did Brothers. *Id.* ¶¶ 2, 27 (Constructors and Brothers were incorporated and paid annual premiums through 2018). The parties agree that Brothers and Constructors were

---

[10]The following statements of fact are deemed admitted, as Plaintiffs properly support them with admissible evidence as required by Local Rule 56.1(a)(3), and Defendants dispute them based only on the contention that "only the circumstances as existed during the Audit Period are relevant." R. 93, PSOF; R. 103, Defs.' Resp. PSOF ¶¶ 32, 44–45, 47, 77–78, 80.

respectively incorporated and operated continuously from 1994 and 2000 through 2018. *Id.*; R. 103, Defs.' Resp. PSOF ¶¶ 15, 20.

The Court agrees with Plaintiffs that these facts do not support a finding that Constructors was "winding down" such that the Court cannot consider whether the single-employer doctrine applied to Brothers and Constructors between July 3, 2017 and December 31, 2017. *See* Pls.' Resp. at 13–14. As Plaintiffs correctly point out, the cases on which Defendants rely support the proposition that the interrelated operations factor of the single-employer analysis is frustrated when one entity ends— or is in the process of imminently ending—its operations just as the other entity begins operations. *See Laborers' Pension Fund v. Innovation Landscape, Inc.*, 2019 WL 6699190, at *11 (N.D. Ill. Dec. 9, 2019) (single-employer analysis "focuses on companies that co-exist," and was less applicable where one company effectively stopped operating while the other company was just starting operations); *Dore & Assocs. Contracting, Inc. v. Int'l Union of Operating Engineers, Loc. Union No. 150*, 2017 WL 3581159, at *10 (N.D. Ill. Aug. 18, 2017) ("[W]hile [entities] technically existed as corporate forms simultaneously, . . . the fact that [they] never operated simultaneously means they are not a 'single integrated enterprise' as required by the single employer test."); *Cent. States, Se. & Sw. Areas Pension Fund v. John Clark Trucking & Rigging Co.*, 2009 WL 780455, at *5 (N.D. Ill. Mar. 19, 2009) (companies could not be part of an interrelated entity two-to-three years after they had ended operations). Here, as noted above, the parties do not dispute that Brothers and Constructors operated simultaneously between 2001 and December 31, 2017.

Therefore, the Court will consider any evidence relating to the single-employer analysis through December 31, 2017, the end of the Audit Period.

### 3. Operation as a Single Employer

Now that the Court has determined *what* facts it can consider to conduct the single-employer analysis, it turns to the analysis itself. If the single-employer doctrine applies, both companies are "equally liable under a collective bargaining agreement entered on behalf of only one of them." *Board of Trustees of the Pipe Fitters Retirement Fund, Local 597 v. American Weathermakers, Inc.*, 150 F. Supp. 3d 897, 905 (N.D. Ill. 2015) (citing *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998)).

To determine whether multiple employers should be deemed a single employer for purposes of contributions under a CBA, the Court must examine four factors: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939, 946 (7th Cir. 2013). No single factor controls; instead, the Court must consider the "totality of the circumstances." *Id.* at 946–47. "[A] single employer finding does not require every factor to be met." *Chicago Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1360 (N.D. Ill. 2016) (internal citations omitted). "Ultimately, single employer status . . . is characterized by the absence of an arm's length relationship found among unintegrated companies." *United Carpet*, 2020 WL 3077541, at *3 (quoting *Cremation Society of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017)).

### i.    Interrelated Operations

In examining the first factor, interrelatedness of companies' operations (i.e., "day-to-day operational matters") are most relevant. *TMG Corp.*, 206 F. Supp. 3d at 1357 (quoting *Lippert Tile*, 724 F.3d at 947). Among other factors, courts consider "whether purportedly separate businesses shared the maintenance of their business records, processed payroll jointly, processed their billing and bank accounts together, and shared space." *Id.* There is significant undisputed evidence in the record that Brothers and Constructors have a high degree of interrelatedness between their operations.

The Seventh Circuit's decision in *Lippert Tile* is instructive here, as the Seventh Circuit concluded that the operations of three entities (Lippert Tile, DeanAlan, and Lippert Group) were interrelated under similar circumstances. Lippert Tile and DeanAlan performed the same type of work in the same region, but they did so for different customers segments (the union and non-union markets). 724 F.3d at 942, 948. Lippert Tile and DeanAlan companies also had separate bank accounts, corporate officers, employees, and insurance programs. *Id.* at 942. Still, the Seventh Circuit concluded that the companies were a single employer because they shared certain daily operations that were critical to the smooth functioning of their work; specifically, they shared office space; and Lippert Group maintained business records, processed payroll, handled billing, and managed the bank accounts for both Lippert Tile and DeanAlan. *Id.* at 942, 947. Lippert Group also decided which company should bid on which project and, if so, what to bid. *Id.* at 947.

Similarly here, Defendants share office space; Defendants' payroll is all run through Industries; Defendants shared clerical staff such as the receptionist and controller; and Defendants' shared outside accountant maintains Defendants' accounts and prepares combined financial statements. R. 103, Defs.' Resp. PSOF ¶¶ 25, 54, 66–67, 70. Other courts in this District have found similar facts to be "more than enough to show that the operations of [two companies] were interrelated." *See Auto. Mechanics' Loc. No. 701 Union & Indus. Pension Fund v. Dynamic Garage, Inc.*, 2018 WL 4699842, at *5 (N.D. Ill. Sept. 30, 2018). But here, the undisputed evidence shows even more examples of interrelatedness: Defendants use a common employee e-mail address, @carlson-construction.net (R. 103, Defs.' Resp. PSOF ¶ 34); use the same phone and fax number (*id.* ¶ 36); use shared computers, office phone system, software, and cell phone plan (*id.* ¶ 55); allow employees to use the same company credit card for expenses for both Brother and Constructors (*id.* ¶ 59); and share a 401(k) plan (*id.* ¶ 64). These factors are also persuasive evidence of interrelated operations. *See Bd. of Trustees of the Pipe Fitters Ret. Fund, Loc. 597 v. Am. Weathermakers,* 150 F. Supp. 3d at 906 (citing *Central States, Southeast & Southwest Areas Pension Fund v. George W. Burnett, Inc.*, 451 F. Supp. 2d 969, 976 (N.D. Ill. 2006); *Moriarty*, 994 F. Supp. at 969–70; *Boudreau v. Gentile*, 646 F. Supp. 2d 1016, 1021 (N.D. Ill. 2009) (all finding some of the same factors to be persuasive)). In addition to sharing the same accountant, Defendants also share the same attorney, registered agent, common insurance program, banks, and signatories on their

accounts (R. 103, Defs.' Resp. PSOF ¶¶ 37–40, 49, 56–58, 65), all of which also support a finding of interrelated operations. *See TMG Corp.*, 206 F. Supp. 3d at 1357.

Moreover, Defendants are all funded from a $5 million joint line of credit that they maintain at First Midwest Bank. R. 103, Defs.' Resp. PSOF ¶¶ 56–58. Defendants promoted themselves as one company: "Carlson Construction." Defendants used a single "Carlson Construction" website containing all of their operations and completed projects, and used a common promoted their operations and all of their completed projects under a common "Carlson Construction" LinkedIn page. R. 103, Defs.' Resp. PSOF ¶¶ 28–32, 34–35.

Defendants, in response, dispute that Brothers and Constructors were engaged in the same kind of work—they argue that Constructors was a highly specialized military contractor while Brothers performed more general types of contracting construction work. Defs.' Resp. at 7. But the record evidence, including statements of fact included in Defendants' Statement of Additional Facts, establish that both Brothers and Constructors were engaged in similar contracting work in the construction industry during the Audit Period. *See* R. 107, DSOAF ¶ 1 (citing R. 113-1 at 7–8, Decl. of Robb Carlson ¶ 21 ("Defendant Carlson Constructors Corporation during 2014 and through July 2017 engaged in general contracting in the construction industry. . . . Defendant Carlson Brothers during 2014 and to date engages in general contracting in the construction industry."). True, during almost the entire Audit Period (beginning in September 2014 and through December 31, 2017), Constructors' only project was the Ft. McCoy Project, a military project in

Wisconsin. R. 117, Pls.' Resp. DSOAF ¶ 9. And Brothers did not perform military contracting work during the Audit Period. *Id.* ¶¶ 10–11. Plaintiffs do not dispute that military regulations imposed different requirements on Constructors, including that it employs "field supervisors, safety and quality managers which [are] not required in the work Brothers[] performed." *Id.* ¶ 11. However, the record belies the weight Defendants give to Constructors' military work and required "specialized" personnel in determining whether its operations were interrelated with Brothers' operations.

First, and importantly, Mark and Robb were responsible for selecting which company—Brothers or Constructors—would bid on which projects. For instance, Mark testified during his deposition that he prepared a bid for the Fort McCoy Projects through Constructors because Constructors, but not Brothers, qualified as a Woman Business Enterprise. R. 117, Pls.' Resp. DSOAF ¶ 10 (citing R. 93 at 634–35 (M. Carlson Dep. 81:11–82:17)); *see also id.* ¶ 12 (citing R. 93 at 627, 634, 654 (M. Carlson Dep. 80:15–81:18, 52:16–53:6, 159:17–160:9) (testifying that he handled bidding for Brothers and Constructors)). *Lippert Tile* held that an important factor weighing in favor of the interrelated operations was that the same personnel made "the critical decision" as to which company "should make a bid on a particular project, and if so, what to bid, as if all three companies were part of the same organizational chart." *Lippert Tile*, 724 F.3d at 947. Second, Brothers' workers were trained to do specialized military quality control work for the Fort McCoy Project. R. 117, Pls.' Resp. DSOAF ¶ 11 (citing R. 94 at 328–331 (E. Kurth Dep. 89:21–92:12) ("A: [W]hen we picked up some of the government work, we hired individuals that would do that

work. Q: The quality control people? A: Right. And some of the Brothers employees that we had, we trained them to work for Constructors too, as well, a few of them. Q: . . . And you had a couple [ ] project superintendent managers and project managers for Carlson Brothers who did the same work for Carlson Constructors, correct? . . . A: Right."). Third, there is no question that before September 2014, Constructor's bid on and worked on non-military construction projects. *See id.* ¶ 8; R. 103, Defs.' Resp. Pls.' SOF ¶¶ 31–32 (Brothers and Constructors both worked on fire station projects and projects for a funeral home). But as discussed above, the relevant time period is the Audit Period, and the type of work Constructors did before that time is of only slight relevance to this analysis. Still, given that (1) Constructors' military contracting work was generally construction work, (2) Brothers' workers were trained to work at Constructors' military sites, and (3) Mark was in charge of bidding on the projects worked on by Brothers and Constructors, the Court finds that Constructors' shift to military projects during the Audit Period does not create a question material fact as to whether Defendants' operations were interrelated.

Defendants argue that there is very little employee interchange during the Audit Period—just three employees out of over one-hundred employed between Brothers and Constructors. Defs.' Resp. at 7–8 (citing R. 107, DSOAF ¶¶ 17–18). As noted above, the record indicates that at least some Brothers employees were trained to work in the specialized military qualify control positions needed by Constructors in or before 2014. But Plaintiffs do not point out how many Brothers employees were so trained or worked for Constructors during the Audit Period, so that weighs only

slightly in favor of finding interchange between employees. Instead, Plaintiffs point out that all employees who did work for either Brothers or Constructs were W-2 employees of Industries.[11] Pls.' Resp. at 14–15 (citing R. 103, Defs.' Resp. PSOF ¶¶ 18, 60–62); *see also* R. 117, Pls.' Resp. DSOAF ¶ 1. Defendants' controller testified that when Industries took over payroll in 2011, it also "took over all of the employees. . . . [E]verybody worked for CB Industries. . . . CB Industries would bill Constructors or Brothers for their pro rata share of the payroll for the week." R. 117, Pls.' Resp. DSOAF ¶ 1 (citing R. 94 at 202 (R. Turner Dep. 103:11–104:7)). The W-2 Forms for Brothers and Constructors' employees also identify "CB Industries, Inc." as the employer. R. 117, Pls.' Resp. DSOAF ¶ 1 (citing R. 116 (Sealed) at 128–132). Constructors' Consolidated Financial Statements states, "Employees - The Company and its affiliates' main labor force is provided by CB Industries whose owners are related to the officers of the Company. Labor is provided at cost and billed weekly to the Company as subcontract labor. Carlson Constructors Corporation also subcontracts some of their employees to Carlson Brothers, Inc., a related party." R. 117, Pls.' Resp. DSOAF ¶ 1 (citing R. 116 (Sealed) at 232).

In their Reply, Defendants dispute the use of the word "employee," but as noted above, they should have moved to file a sur-response to Plaintiffs' Summary Judgment Motion if they wanted to dispute arguments from Plaintiffs' Reply. Still, the evidence does not support that all employees actually performed work for Industries; clearly they worked for either Brothers, Constructors, or both. But the

---

[11]As above, the Court does not consider Plaintiffs' Statements of Additional Fact supporting their own Summary Judgment Motion. R. 116 (Sealed), Pls.' SOAF ¶¶ 10–13.

Court does agree that the evidence demonstrates that Industries acted as more than a standard payroll company, which this Court finds weighs in favor of interrelated operations. *See, e.g.*, *Lippert Tile*, 724 F.3d at 947 (interrelated operations where Lippert Group "maintains business records, processes payroll, handles billing, and manages bank accounts for both companies, and these shared, daily operations are critical to the smooth functioning of the project-by-project nature of both companies' work."); *see also Am. Weathermakers, Inc.*, 150 F. Supp. 3d at 906–07 (interrelated operations even where no employees shared).

Finally, Defendants point to the fact that they maintained separate bank accounts and filed separate tax returns, maintained separate financial records, and paid their subcontractors separately. Defs.' Resp. at 8. True enough, but the Court agrees with Plaintiffs that such evidence "only serves to show that Companies are nominally separate entities, which is the starting point for single-employer analysis." Pls.' Resp. at 17 (citing *American Weathermakers*, 150 F. Supp. 3d at 905–07) (finding single-employer relationship between defendants even though defendants maintained separate accounts and financial records, filed separate tax returns, did not co-mingle funds or share employees because defendants "leverage[d] their combined purchasing power and economies of scale, share[d] the same benefit plans, infrastructure, office space and third-party outside services"). Altogether, the Court finds that the facts demonstrate integration between Brothers and Companies, and as such, the first factor weighs in favor of Plaintiffs.

### ii.      Common Management and Centralized Control of Labor Relations

Courts consider similar facts when determining the next two factors—common management and centralized control of labor relations. *See Auto. Mechanics' Loc. No. 701 Union & Indus. Pension Fund v. Dynamic Garage, Inc.*, 2018 WL 4699842, at *6 (N.D. Ill. Sept. 30, 2018). In analyzing whether two entities share common management, the Seventh Circuit has focused on common control over hiring and firing of employees, as well as other daily management decisions. *Id.* (citing *N.L.R.B. v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1288–89 (7th Cir. 1989)). Similarly, when determining control over labor relations, courts consider, among other things, the person or entity who was responsible for the day-to-day labor decisions like setting wages, hiring, and firing. *Lippert Tile Co.*, 724 F.3d at 947.

Defendants do not dispute that Mark and Robb were responsible for hiring and firing key management employees for Defendants. R. 103, Defs.' Resp. PSOF ¶ 74. Rather, they contend that Mark and Robb were not the *only* people who had hiring authority, and that they did not hire every employee. *Id.*; *see also* R. 117, Pls.' Resp. DSOAF ¶ 22 (Fort McCoy superintendent was primarily responsible for hiring temporary labor, and Project's quality supervisor engaged in hiring labor). Notably, neither party specifies who had authority for firing employees other than key management personnel. Nor do the parties identify who was responsible for setting wages. Nancy, however, testified that whoever hired employees would decide on their wages. R. 93, PSOF ¶ 74 (citing R. 93 at 698 (N. Carlson Dep. 154:17–155:4)). So this could be Mark and Robb, or the site superintendent or quality control supervisor.

Defendants point out that the Ft. McCoy superintendents and project managers "managed the daily labor and production matters," including "not[ing] the work each [contractor] performed on a given day and adjusted any issues with the contractors." R. 117, Pls.' Resp. DSOAF ¶ 21. Superintendents approved weekly time sheets for Constructors' employees at the Ft. McCoy Project and submitted those timesheets to Constructors' office personnel for processing by CB Industries for payroll purposes. *Id.* ¶ 24.

On the other hand, Plaintiffs emphasize that Robb supervised the project managers of both Brothers and Constructors jobs, including managing day-to-day workloads and managing construction projects at a very high level. R. 93, PSOF ¶ 76 (citing R. 94 at 182 (J. Swartz Dep. 21:23–22:6)). Defendants deny that Robb's responsibilities included such management. R. 103, Defs.' Resp. PSOF ¶ 76. However, Defendants' response does not cite to any record evidence as required by the Local Rules, but rather cites to their own Statement of Additional Facts. *Id.* (citing R. 107, DSOAF ¶¶ 21–24). As indicated above, such citations do not comply with Local Rule 56.1 and the Court deems Plaintiffs' statement admitted. But even considering the cross-referenced additional statements does not create a material dispute of facts here. Defendants' statements of additional fact detail the responsibilities of the Ft. McCoy superintendents and project managers. R. 107, DSOAF ¶¶ 21–24. Plaintiffs do not dispute those duties, but the fact that the superintendents and project managers had day-to-day supervision over employees at the Ft. McCoy site does not

foreclose Robb from supervising project managers and managing construction projects "at a very high level."

Plaintiffs also point to Mark's responsibility to bid on projects for Brothers and Constructors, including determining whether a project would become a Brothers or Constructors Project. Pls.' Resp. at 18 (citing R. 103, Defs.' Resp. PSOF ¶ 80). Plaintiffs accuse Companies of "fabricat[ing] issues of fact" (by arguing that Nancy submitted the bid for the Fort McCoy Project) and point to testimony from Mark and Nancy stating that she did not submit the bid. Pls.' Resp. at 19 (citing Defs.' Resp. at 9). But the Court agrees with Defendants that the evidence does not support this accusation. Rather, it shows that although Mark "prepared" the bid, Nancy "submitted" it. *See* R. 117, Pls.' Resp. DSOAF ¶ 6 (citing R. 93 at 634 (M. Carlson Dep. 80:15–81:18)); R. 108-1 (Sealed) at 25 (form submitted by Constructors to Army to solicit Contract, signed by Nancy). But the evidence is also clear that while Nancy may have signed and submitted the bid, she had no role in preparing that bid or any others on behalf of Constructors. *See* Pls.' Resp. at 19–20 (citing R. 117, Pls.' Resp. DSOAF ¶ 6 (citing R. 93 at 634 (M. Carlson Dep. 80:15–81:18) (Mark learned about the opportunity to submit a proposal and prepared the bid for Constructors)), *id.* (citing R. 93 at 690–91, 697 (N. Carlson Dep. 125:4–126:7, 153:4–5, 153:22–25) (denying being involved in the bidding process, including the preparation of bids, for Constructors' projects))). Defendants insist that because Nancy submitted the Ft. McCoy Bid and signed several other documents, including a credit application and tax returns, separate management exists. Defs.' Reply at 14–15 (citing *Trustees of*

40

*Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Loc. 701 v. Favia Elec. Co.*, 995 F.2d 785, 788 (7th Cir. 1993)).

In *Favia Elec. Co.*, the court found that nominally separate management existed where the president of one of the companies "was not simply a figurehead; instead, she was active in filing annual reports and paying taxes." 995 F.2d at 788. Here, as discussed more fully below, Defendants admit that Mark and Robb started Constructors in 2000 and made Nancy and Laurel the "paper owners" because they hoped to qualify Constructors as a women-owned business enterprise. R. 103, Defs.' Resp. PSOF ¶ 19. In reality, Mark and Robb, not Nancy, engaged in all high-level management decisions.

Although the third and fourth factors are closely related, the Court finds here that the third factor—common management—weighs in favor of Plaintiffs, while the fourth factor—labor relations—weighs in favor of Defendants. Based on Robb and Mark's role in hiring and firing key management employees, Robb's engagement in high-level management, Mark's involvement in selecting and submitting bids, and the common management functions such as Industries' involvement in payroll, Plaintiffs have satisfied the common management factor. However, the evidence demonstrates that different people had the ultimate power to, at the very least hire, employees for Brothers and Constructors' respective project sites. The record is unclear on who has the power to terminate these employees or to set their wages, however. Therefore, the centralized control of labor relations factor weighs slightly in favor of Defendants. *See Am. Weathermakers, Inc.*, 150 F. Supp. 3d at 907 (finding

the third factor weighed in favor of single-employer finding where one entity was responsible for accounting, billing, and human resources for two companies, but finding that the fourth factor weighed against the single-employer analysis because different people had the ability to hire and fire employees at the two companies).

### iii.    Common Ownership

This leaves the fourth factor. Perhaps stating the obvious, "[c]ommon ownership typically applies when two companies are owned by the same individual(s)." *United Carpet*, 2020 WL 3077541, at *3 (quoting *Fox Valley & Vicinity Construction Workers Welfare Fund v. Morales*, 2019 WL 247538, at *3 (N.D. Ill. Jan. 17, 2019)). "'Financial control,' can be a proxy for 'common ownership' in a single-employer analysis." *Innovation Landscape*, 2019 WL 6699190, at *11 (quoting *Naperville Ready Mix, Inc. v. N.L.R.B.*, 242 F.3d 744, 752 (7th Cir. 2001)).

The common ownership analysis *after* August 25, 2015 is easy. Robb acquired Nancy's 50% interest in Constructors on that date. R. 103, Defs.' Resp. PSOF ¶ 20. And at all relevant times, Robb and Mark each owned a 50% interest in Brothers and in Industries. *Id.* ¶¶ 15–16. Therefore, between August 25, 2015 and December 31, 2017, Robb was a common owner of Brothers and Constructors.

The more difficult question is whether common ownership existed between July 1, 2014 and August 25, 2015, before Robb acquired Nancy's interest in Constructors. Nancy and Laurel, Robb and Mark's spouses, respectively, each owned a 50% interest in Constructors during that period. R. 103, Defs.' Resp. PSOF ¶¶ 19– 20.

Defendants correctly point out that, on its own, a husband-wife relationship is insufficient to establish common ownership. Defs.' Resp. at 11 (citing *United Carpet*, 2020 WL 3077541, at *4; *Chicago Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1360 (N.D. Ill. 2016) (distinguishing alter ego cases and rejecting proposition that ownership and control of two companies by members of the same family is evidence of common ownership)). But here, unlike the family members in *United Carpet* and *TMG Corp.*, who each owned and actively managed the separate entities, the facts here establish that Robb and Mark not only were married to Constructors' owners but were also the *de facto* owners of Constructors.

Defendants admit that Mark and Robb started Constructors in 2000 and made Nancy and Laurel the "paper owners" because they hoped to qualify Constructors as a women-owned business enterprise. R. 103, Defs.' Resp. PSOF ¶ 19. Mark and Robb made all major management decisions for Constructors, including signing the Constructors CBA, who to hire as Defendants' controller, and whether Constructors or Brother would submit bids for which projects. *Id.* ¶¶ 24, 73–74, 76, 78, 80. Additionally, Mark signed contracts on behalf of Constructors and Mark and Robb were signatories on Constructors' bank accounts. *Id.* ¶¶ 49, 78. In 2010, Mark and Robb decided to replace Nancy with Rosalia Turner as the president of Constructors. *Id.* ¶ 79. In contrast, Laurel had no active role in Constructors, but rather occasionally signed documents presented to her that that she admitted she did not understand. *Id.* ¶¶ 21–22. She was not authorized to sign on its bank account, and had no knowledge of Constructors' past loans or loans in existence at the time of her

2019 deposition. *Id.* ¶¶ 23, 49. Nancy lived in Florida since 2009 and handled only credit card reconciliations and payroll for all of the Companies remotely from Florida until 2015, when she stopped working for any of the Companies. *Id.* ¶¶ 24–26. Finally, Brothers and Constructors held themselves out to have common ownership: during the Audit Period, Brothers and Constructors entered into insurance agreements and bond programs with major insurance companies that required them to have common ownership.[12] *Id.* ¶¶ 40, 44. Together, these facts[13] establish that Laurel and Nancy were not active managers of Constructors like the defendant family members in *United Carpet* and *TMG Corp.*, but rather that Mark and Robb were the *de facto* owners of Constructors.

Other courts in this District have held that similar facts could support or have supported a finding of common ownership in support of the single-employer analysis. In *Sullivan v. Tag Plumbing Co.*, 2012 WL 3835526, at *4 (N.D. Ill. Sept. 4, 2012), the court held that common ownership existed for single-business purposes where a husband and wife each owned an entity; where the husband relinquished the role of

---

[12]The Court does not consider the fact that Mack & Associates prepared combined financial statements for Brother and Constructors that also required them to have common ownership (Pls.' Resp. at 21 (citing R. 116 (Sealed), PSOAF ¶ 9)), as the Court finds that this fact was improperly included in Plaintiffs' Statement of Additional Facts in support of Plaintiffs' Motion for Summary Judgment as opposed to included in opposition to Defendants' Motion. *See supra* Section I.

[13]Although some of these acts took place before the Audit Period (e.g., Brothers did not bid on a job after 2014 (R. 103, Defs.' Resp. PSOF ¶ 79)), the Court finds the facts cited herein to be relevant to the common ownership over Brothers and Constructors during the Audit Period (e.g., because Mark and Robb made decisions on which bids for Brothers and Constructors to make, the decision *not* to bid after 2014 would have been made by them, as well).

president in the wife's company but remained as the company's treasurer and vice president; his duties and involvement remained the same after transfer of ownership to his wife; and the wife's responsivities were limited to clerical work despite her sole ownership and role as president. As noted above, in *United Carpet*, 2020 WL 3077541, at *4, the court noted that the spousal relationship where each spouse was an active manager of his/her own company could not form the basis of common ownership. In so holding, *United Carpet* distinguished *Suhadolnik v. U.S.*, 2011 WL 2173683, *6 (C.D. Ill. June 2, 2011), where the court held common ownership existed for purposes of the Internal Revenue Code because the IRS presented evidence showing that the husband was a *de facto* owner of his wife's company for tax purposes because he: had the authority to collect and pay trust fund taxes; hired employees and determined their salaries; set the company's financial policies; led weekly meetings where tax issues were discussed; reviewed balance sheets and income tax returns; prioritized expenses; and was a signatory on the company's bank accounts. As in *Sullivan* and *Suhadolnik*, the facts here support a finding that Mark and Robb were *de facto* owners of Constructors for purposes of the common ownership factor. Therefore, common ownership was present during the entire Audit Period, and the fourth factor weighs in favor of Plaintiffs.

### iv.    Summary

Altogether, a reasonable factfinder must conclude that Brothers and Constructors (and Industries) did not have an arm's-length relationship, and therefore they comprise a single employer. *See Lippert Tile*, 724 F.3d at 947. Their

operations are interrelated, and they share the same owners (actual or *de facto* depending on the years). Though different people have the ultimate power to hire employees so the control over labor relations is not centralized, Robb and Mark, along with Industries, manages the workforce. Even when the evidence is viewed in the Defendants' favor, the records establishes that the two companies were a single employer. *See id.* at 947–48 (affirming single-employer finding even though centralized control over labor relations remained disputed); *Am. Weathermakers*, 150 F. Supp. 3d at 906 (same).

However, just because Defendants have been deemed a single employer does not automatically mean Brothers and Industries are on the hook for unpaid contributions—the next question is whether Brothers violated the CBA/Area Agreement by subcontracting work between July 1, 2014 and December 31, 2017. *See, e.g. Auto. Mechanics' Loc. No. 701 Union & Indus. Pension Fund v. Dynamic Garage, Inc.*, 2018 WL 4699842, at *7 (N.D. Ill. Sept. 30, 2018) (determination that companies constituted a single employer, court must engage in analysis as to whether the CBA applied to non-signatory's employees). Neither party moves for summary judgment as to whether Brothers—or Industries—violated the CBA/Area Agreement. Therefore, although this Court determines as a matter of law that Defendants are a single employer and therefore are bound by the Area Agreement, it does not now weigh in on whether there was a violation of the Area Agreement by any Defendant.

## C.   Alter-Ego Analysis

The Court briefly analyzes Plaintiffs' alternative basis of liability, that Brothers was an alter ego of Constructors. "To establish that one company is an alter ego of another, a plaintiff must demonstrate 'the existence of a disguised continuance of a former business entity or [an] attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.'" *TMG Corp.*, 206 F. Supp. 3d at 1361 (quoting *Favia*, 995 F.2d at 789). "When attempting to discern whether a new company is another's alter ego, courts (or, at trial, finders of fact) engage in a fact intensive analysis, examining factors like whether the two companies have 'substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.'" *Trs. of Chi. Painters and Decorators Pension Fund v. John Kny Painting & Decorating, Inc.*, 2016 WL 406328, at *3 (N.D. Ill, Feb. 3, 2016) (quoting *Int'l Union of Operating Eng'rs, Local 150, AFL–CIO v. Rabine*, 161 F.3d 427, 433 (7th Cir. 1998)). But the alter-ego analysis differs from the single-employer doctrine in that "unlawful motive or intent is the most critical factor for finding alter ego status in the Seventh Circuit." *Id.* (noting that motive or intent is not the keystone in some other circuits). No individual factor is dispositive in determining whether an alter-ego relationship exists, but "the Seventh Circuit considers unlawful motive or intent to avoid collective bargaining agreement obligations to be the critical elements of the inquiry." *Favia*, 995 F.2d at 789. Because the Court addressed the first part of the alter-ego test in its single-employer

discussion (finding in favor of Plaintiffs), the Court now turns to the new issues of motive and intent.

As Defendants point out, Plaintiffs' alter-ego argument is not well-developed. Defs.' Resp. at 3. Plaintiffs claim that Defendants "attempt to use Constructors as a means to pay fringe benefit contributions on some of [Defendants'] employees working on "Brothers" projects while avoiding paying contributions on other employees. Pls.' Memo. Summ. J. at 15 n.2; Pls.' Resp. at 23. The Court agrees with Defendants that it is illogical that Brothers, if it wanted to evade alleged contribution obligations, caused Constructors to sign the same Area Agreement it wanted to avoid. Defs.' Resp. at 4 (citing *Architectural Iron Workers Loc. No. 63 Welfare Fund v. United Contractors, Inc.*, 46 F. Supp. 2d 769, 789 (N.D. Ill. 1999) (where first-created company was a signatory to a CBA, the alter-ego theory did not apply to second-created company that singed CBA, noting that "far from attempting to evade union obligations, the defendants, by creating [the second company] and allowing it to become a union shop, were responsible for benefit fund contributions that would not have otherwise been made")). Although the Court has held that the Brothers CBA had not terminated in 1998, and thus was in effect when Constructors was formed in 2000, Defendants' choice to sign the Constructors CBA is still illogical if their intent was to evade the Area Agreement.

The cases cited by Plaintiffs in support of their argument that Constructors began to "wind down" shortly after Plaintiffs made demands on Defendants and filed this lawsuit are of no help to Plaintiffs. In *Bd. of Trustees of Plumbers & Pipefitters*

*Loc. No. 172 Welfare Fund v. Matrix Plumbing & Heating, Inc.*, 2012 WL 1066758, at *6 (N.D. Ind. Mar. 28, 2012), the court found wrongful intent to defraud where, after judgment was entered against the defendant company, defendants entered into an agreement with an individual, providing that individual would not assume the defendant company's liabilities. Approximately a month later, the defendant company's owner was served with a notice to appear for a debtors' examination of the defendant company; one day after that, the individual incorporated a new company. *Haka v. Lincoln Cty.*, 533 F. Supp. 2d 895, 912 (W.D. Wis. 2008) did not address an alter-ego theory, but rather the court found wrongful intent from the employer's retaliatory actions taken after it received notice of the employee's participation in a false claims complaint against the employer.

The facts surrounding Constructors' "winding down" are nowhere near as suspect as those at issue in *Matrix Plumbing* or in *Haka*. Rather, the evidence establishes that Constructors received a notice of substantial completion from the government for the Ft. McCoy Project on July 3, 2017. R. 117, Pls.' Resp. DSOAF ¶ 9. Constructors had not actively worked on any projects other than the Ft. McCoy Project since September 2014. *Id.* Deciding to close operations when its only project for the last four years ends is well within the bounds of a reasonable business decision. The Court cannot infer wrongful intent from the record, and therefore Plaintiffs' alter-ego theory fails.

In sum, the Court finds that both Industries and Brothers are also bound to the Constructors CBA under the single-employer analysis. The Court grants partial summary judgment in favor of Plaintiffs.

## IV.    Defendants' Motion: Equitable Affirmative Defenses

Defendants[14] move for summary judgment based on the equitable doctrines of doctrine equitable estoppel and laches, arguing that even if (1) the Brothers CBA did not terminate until 2019, and (2) Brothers is bound to the Contractors' CBA via the single-employer and/or alter-ego doctrines, Plaintiffs' actions prevent them from pursuing their claims against Brothers. As the Court has found that (i) the Brothers' CBA did not terminate until 2019 and (ii) that Brothers is bound to the Contractors' CBA via the single-employer theory, it now evaluates Defendants' affirmative defenses as they apply to each CBA.

Defendants' motion for summary judgment presupposes that equitable estoppel and laches are available defenses in an ERISA action involving a multi-employer pension plan. Defs.' Reply at 5 (citing *Teamsters & Emps. Welfare Tr. of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877 (7th Cir. 2002)). Plaintiffs, on the other hand, contend that equitable estoppel and laches are not available defenses in cases involving withdrawal liability in multiemployer plans. Pls.' Resp. at 4 (citing *Kabbes Trucking Co.,* 2004 WL 2644515). The Court notes that the state of the law is not so clear.

---

[14]Although all Defendants move for summary judgment, their arguments apply only to Brothers, not to Constructors or to Industries. *See generally* R. 104, Defs.' Br.; Defs.' Reply. As such, the Court evaluates Defendants' equitable estoppel and laches defenses only as they apply to Plaintiffs' claims against Brothers.

ERISA does not mention any equitable defenses, such as estoppel or laches. "While the federal courts have the power to create federal common law, this can occur 'only where the federal statute does not expressly address the issue before the court [and only if the proposed common law] is consistent with the policies underlying the federal statute in question." *Kabbes Trucking*, 2004 WL 2644515, at *21 (quoting *Nachwalter v. Christie*, 805 F.2d 956, 959–60 (11th Cir. 1986)). "The Seventh Circuit has expressed a 'real resistance to the use of [equitable estoppel]' in the ERISA context due to concerns about a plan's 'actuarial soundness.'" *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 180 F. Supp. 3d 540, 555 (N.D. Ill. 2016) (quoting *Black v. TIC Inv. Corp.*, 900 F.2d 112, 115 (7th Cir. 1990)). True, in *Gorman*, the Seventh Circuit held that an employer could assert a laches defense in a multiemployer-plan action, (although, the employer in that case did not ultimately succeed because it could not show reliance). 283 F.3d at 883. In *Gorman*, an audit revealed that the employer had failed to make pension contributions, but the union promised to make the audit "go away." *Id.* at 880. It is unclear, however, whether *Gorman* definitively held that equitable estoppel is a defense in cases involving *withdrawal liability* in multiemployer plans, because the case was ultimately about the laches defense in a delinquency action.

*Kabbes*, the only case cited by Plaintiffs for the proposition that equitable defenses are not applicable in multiemployer-plan action cases, is distinguishable. As Defendants correctly point out, unlike *Kabbes*, here, Plaintiffs do not claim that allowing an equitable defense will modify any trust fund provision. Defs.' Reply at 5.

51

At least one court in this District has allowed the equitable estoppel defense and held that it barred summary judgment in favor of Plaintiff funds in a multiemployer withdrawal liability case. *See Hancock v. Ill. Cent. Sweeping LLC*, 73 F. Supp. 3d 932, 943 (N.D. Ill. 2014) (explaining that "[the Seventh Circuit] has not yet, as far as the court can tell, explicitly approved [the] use [of equitable estoppel] as an affirmative defense in an action brought by a multiemployer plan," but considered the defense because the plaintiff did not object); *see also Trustees of the Michiana Area Elec. Workers Pension Fund v. La Place's Elec. Co., Inc.*, 2017 WL 633847, at *6 (N.D. Ind. Feb. 15, 2017) (discussing cases).

In the absence of any binding precedent that equitable estoppel or laches are not available defenses in cases involving withdrawal liability in multiemployer plans, the Court will proceed as though these equitable defenses are available to Defendants, to the extent indicated in the analysis below.

### A. Equitable Estoppel

In the context of a claim by multi-employer benefit funds seeking contributions from an employer, "[a]n estoppel arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation." *Pattern Makers' Pension Trust Fund v. Production Pattern Shop, Inc.*, 1998 WL 173299, at *3 (N.D. Ill. 1998) (citing *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir. 1990)). The principles of waiver and estoppel support the notion that a party to a contract may not lull another into a false assurance that strict compliance with a contractual duty will not be required and

then sue for non-compliance. *Saverslak v. Davis Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979).

Defendants maintain that Plaintiffs are estopped from holding Brothers liable for contributions based on the Brothers' CBA because Plaintiffs' repeated conduct between 1998 and the filing of the lawsuit led Defendants to reasonably believe that the Brothers CBA had terminated.[15] Specifically, Defendants point to the settlement agreement between Plaintiffs and Brothers, drafted by Plaintiffs' attorneys, in which the Termination Recital stated that the Brothers CBA had terminated on May 31, 1998. R. 104, Defs.' Br. at 2. The record establishes that the settlement agreement containing that Recital was (1) drafted by Plaintiffs' attorneys, (2) sent to Defendants by Plaintiffs' counsel on or about January 5, 2000, and (3) signed by Brothers and Plaintiffs' representatives. R. 116 (Sealed), Pls.' Resp. DSOF ¶¶ 15–16. Plaintiffs dispute whether the Settlement Agreement, including the termination language, was drafted solely by Plaintiffs' attorney, Dan McAnally, without any input or request for language from Brothers' attorney. *Id.*; R. 116 (Sealed), PSOAF ¶ 17. Plaintiffs cite to McAnally's declaration, in which he states "that on July 6, 1999, [he] had a telephone conversation with Robb Carlson related to the Lawsuit. During that conversation Mr. Carlson told [him] that the Union terminated its agreement with Carlson Brothers effective May 1998." R. 116 (Sealed) at 87 (McAnally Decl. ¶ 4). McAnally states that he included the Termination Recital in the Settlement Agreement pursuant to that

---

[15]Defendants' Motion for Summary Judgment focuses its equitable estoppel argument on the Brothers' CBA. *See* Defs.' Br. at 5–8. To the extent Defendants argue that Plaintiffs are estopped from asserting that Brothers and Constructors are a single employer, the Court considers it together with Defendants' laches argument below.

conversation. *Id.* Defendants deny that this conversation occurred, and cite to a declaration from Robb in which he states that he "did not have a discussion with the Funds' lawyer regarding the issue of Brothers' CBA terminating." R. 121-1 at 3 (R. Carlson Decl. ¶ 6). The Court cannot weigh the credibility of this conflicting evidence at summary judgment.

Several years later, in response to Plaintiff's request to audit Brothers, around July 30, 2002, Robb informed the auditor that Brothers was not a signatory to a contract as its agreement with the union terminated on May 31, 1998. R. 116 (Sealed), Pls.' Resp. DSOAF ¶ 20. Robb then submitted the signed Settlement Agreement to the auditor and stated this was the "termination" they discussed. *Id.* After receiving the Settlement Agreement, the auditor informed Plaintiffs that Robb had told him the Brothers' agreement with the union was terminated as of May 31, 1998, and asked Plaintiffs to "please advise." *Id.* ¶ 21. Robb heard no response from either the auditors or Plaintiffs, and Plaintiffs did not pursue the audit further against Brothers. *Id.*

In 2008, in response to Plaintiffs' attempt to audit Brothers in connection with its audit of Constructors, the auditor was told that Plaintiffs did not have the right to review Brothers' records, and he conveyed that information to Plaintiffs. R. 116 (Sealed), Pls.' Resp. DSOAF ¶¶ 24, 25, 27. Plaintiffs ceased further efforts to audit Brothers. R. 116 (Sealed), Pls.' Resp. DSOAF. *Id.* Years later, in May 2014, Plaintiffs audited Constructors but did not seek to audit Brothers. *Id.* ¶¶ 32, 35. Then most

relevant here, in May 2014, Plaintiffs initiated an audit of Constructors but did not request to audit Brothers. *Id.* ¶¶ 32–37.

Plaintiffs do not dispute any of the above facts, but rather take issue with the implication that Plaintiffs did not complete the audits because the Brothers CBA had terminated; rather Plaintiffs point to evidence establishing that the 2002 and 2008 audit requests were dropped because Brothers advised the auditors that it was performing only asphalt and curb work, which is outside the Union's jurisdiction. R. 116 (Sealed), Pls. Resp. DSOF ¶¶ 12, 22, 25, 27; R. 116 (Sealed), PSOAF ¶¶ 3–4. Defendants dispute that the evidence in fact shows that Plaintiffs learned this information from Brothers, as the records cited by Plaintiffs do not support this. R. 116 at 83, 85.

Plaintiffs' Audit Department Supervisor, John Conklin (Conklin) submitted a declaration stating that, "[a]ccording to the Trust Funds' records, the Trust Funds concluded the audit of Brothers in 2002 because Brothers advised the auditors that it was performing asphalt and curb work only." R. 116 (Sealed) at 52 (Decl. of J. Conklin ¶ 10). Defendants contests that this statement is inadmissible under Federal Rule of Evidence 1002 (the Original Writing Rule). Defs.' Reply at 10 (citing *KFC Corp. v. Iron Horse of Metairie Rd., LLC*, 2020 WL 3892989, at *8 (N.D. Ill. July 10, 2020)). But Defendants misunderstand Rule 1002. The Original Writing Rule requires the parties to rely on "[a]n original writing, recording, or photograph . . . to prove its content unless [the Federal Rules of Evidence] or a federal statute provides otherwise." FED. R. EVID. 1002. The court in *KFC Corp.* held that parts of an affidavit

violated Rule 1002 because the affiant sought to introduce the content of a competing contract solely through his affidavit, without attaching the competing contract itself to the affidavit or otherwise to the summary judgment motion. 2020 WL 3892989, at *8. Here, the Audit Records—the "original writing" that Conklin interpreted in his declaration—are part of the record. R. 116 (Sealed) at 83, 85. Conklin also stated that his job responsibilities included "reviewing the Trust Funds' files and . . . gathering documents related to the Trust Funds' audits of [Constructors] and [Brothers]." R. 116 (Sealed) at 51 (Decl. of J. Conklin ¶ 4). Under Rule 803(6), a "qualified witness," meaning "someone who understands the system," can testify about the contents of a record kept in the ordinary course of business. *See United States v. Keplinger*, 776 F.2d 678, 694 (7th Cir. 1985). Based on the record evidence, it appears that Conklin can testify about the audit records under this Rule. The Court need not decide whether Conklin's declaration includes the necessary foundation, as "[t]o be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible." *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (internal citations omitted).

But Conklin's statement is disputed, as Robb's declaration again contains competing facts. R. 121-1 at 4–5 (R. Carlson Decl. ¶ 12) ("After July 30, 2002, Brothers heard nothing from the Funds related to collective bargaining until February 2008. This included no discussion of the type of work Brothers performed prior to, during or after 2002."). Again, it is not the Court's role at summary judgment to weigh the credibility of competing evidence. Although Plaintiffs produce no evidence that they

communicated the reasons for not pursuing the audits to Defendants in 2002 or 2008, Defendants' alleged statements about Brothers' work is material to the extent that Defendants understood such statements to be relevant to an audit and therefore indicated that Defendants were aware that the Brothers CBA had not—or may have not—terminated in 1998.

Since receiving the Settlement Agreement containing the Termination clause in 2000, Brothers states that it understood that the Brothers CBA was terminated, and as such, it had no obligations pursuant to the Brothers CBA. R. 116 (Sealed), Pls.' Resp. DSOF ¶ 17. Brothers interpreted Plaintiffs and their auditors' silence in 2002 and 2008 as confirmation that it was not subject to the Brothers CBA and had no obligations to submit to an audit by Plaintiffs, and proceeded with its business accordingly. *Id.* ¶ 22. In 2014, Defendants were aware of the audit of Constructors, and understood that because Plaintiffs did not seek to audit Brothers, Brothers had no obligations under the Area Agreement. *Id.* ¶ 37.

Finally, Defendants argue that their reliance on Plaintiffs' conduct harmed Defendants because the Area Agreement at issue requires employers who employ subcontractors to either (i) require the subcontractor to become a signatory to the Area Agreement, or (ii) the employer shall maintain daily records of the employees who perform the work and then pay the requisite fringe benefit contributions for the work performed by those employees. Defs.' Reply at 12 (citing R. 103, Defs.' Resp. PSOF ¶ 8). Defendants posit that if Brothers had known that it was bound to the Area Agreement, it could have either required subcontractors to sign the Area

Agreement, hired only subcontractors bound by the CBA, or demanded daily records of subcontractor hours worked. *Id.* To the extent the CBA imposed greater costs on the subcontractor, which it passed to Brothers, Brothers could have adjusted its pricing to its customers. *Id.* But now, after the Audit Period has ended, Brothers cannot pass along costs to its customers nor can it comply with the CBA by maintaining hours of records worked. *Compare Am. Weathermakers*, 150 F. Supp. 3d at 909 (defendants were not harmed because the only steps they could have taken if they had known of plaintiffs' claim sooner would be to make the contributions that were in dispute).

On the summary judgment record, a reasonable factfinder could conclude that Plaintiffs' conduct was misleading, and that Defendants' reasonably relied on that conduct to their detriment in determining that the Brothers CBA had terminated in 1998. Therefore, questions of material fact exist as to the equitable estoppel defense, precluding the Court from granting summary judgment in Defendants' favor. However, this finding *also* necessarily precludes entry of summary judgment in Plaintiffs' favor as to whether Brothers is bound to the Brothers CBA after 1998.

The Court now turns to Defendants' motion for summary judgment based on laches. "Laches and equitable estoppel are interchangeable" because "conduct claimed to create an estoppel consists mainly of delay that gives the defense a laches flavor, since laches means delay." *Gorman Bros.*, 283 F.3d at 882.

### B. Laches

In order to succeed under the doctrine of laches, Defendants must show that: (1) Plaintiffs unreasonably delayed in asserting their rights, and (2) the delay harmed Brothers. *Am. Weathermakers*, 150 F. Supp. 3d at 908 (citing *Gorman Bros.*, 283 F.3d at 880). To show an unreasonable delay, the Court begins by determining when Plaintiffs first knew, or reasonably could have known, that they had a single-employer cause of action. *Id.* The Court should not stretch the reasonable boundaries of knowledge to conclude that a fund knew it had a cause of action. *Id.* (citing *Cent. States, Se. & Sw. Areas Pension Fund v. The Kroger Co.*, 2004 WL 2452737, at *12 (N.D. Ill. Nov. 1, 2004)). Additionally, as a general matter, laches is not a defense to an action filed within the applicable statute of limitations. *U.S. v. Mack,* 295 U.S. 480, 489 (1935). The applicable statute of limitations to an ERISA contribution action is ten years. *Cent. Illinois Carpenters Health & Welfare Tr. Fund v. S&S Fashion Floors Inc.*, 2008 WL 11366276, at *2 (C.D. Ill. Apr. 29, 2008) (citing *Central States, Southeast and Southwest Areas Pension Fund v. Jordan*, 873 F.2d 149, 154 (7th Cir. 1989)).

Although multiple courts in this District have held that the doctrine of laches can apply to contribution claims brought under ERISA, *see, e.g.*, *Dore & Assocs. Contracting*, 2017 WL 3581159, at *11; *Cent. States, Se. & Sw. Areas Pension Fund v. The Kroger Co.*, 2004 WL 2452737, at *12 (N.D. Ill. Nov. 1, 2004), Defendants cite only one case—and the Court is aware of only one—that applies the doctrine of laches

to a single-employer claim forming the basis for a claim for contribution. *See Am. Weathermakers*, 150 F. Supp. 3d at 909.

In *Am. Weathermakers*, the court did not definitively decide whether laches is available as a defense, because it held that the defense failed on the merits. *Id.* at 908. The court held that the Plaintiffs had not unreasonably delayed bringing a single-employer claim where Plaintiffs learned during an earlier audit that the two companies shared an owner and provided similar services—"[w]ithout more, this knowledge, let alone Plaintiffs knowing only the name [of the Company], would not have supplied a reasonable basis for bringing suit." *Id.* at 909. The Court is not convinced the defense is appropriately applied to single-employer claims on their own—even if a fund had a reasonable basis for believing two employers are a single employer, that relationship in itself is not a reasonable basis for a fund to bring suit against the two companies—rather, the fund would need additional information related to a potential violation of the CBA by one or more of the companies forming the single employer.

But here, Defendants provide more evidence of Plaintiff's pre-suit knowledge of a potential single-employer relationship than the plaintiffs in *Am. Weathermakers*. Defendants point to evidence that during a 2002 audit of Brothers, Plaintiffs noted to their auditor that Constructors and Brothers are associated accounts, and Plaintiffs suspected that Industries is an alter ego of Brothers, so the auditor should prioritize its review. Defs.' Reply at 8 (citing R. 116 (Sealed), Pls.' Resp. DSOF ¶ 19 (citing R. 116 (Sealed) at 78 (audit request); R. 112-2 at 25–26 (A. Conklin Dep. 95:11–98:1))).

Additionally, they point out that Plaintiffs' audit procedures identify an "alter ego/single employer" audit, which describe what factors and records to review. *Id.* at 8–9 (citing R. 116 (Sealed), Pls.' Resp. DSOF ¶ 23). In 2008, Plaintiffs sought to audit Brothers because it was "associated" with Constructors; although Plaintiffs did not pursue the audit, they obtained a report about Brothers showing Brothers' address, officers, financial data. *Id.* at 9 (citing R. 116 (Sealed), Pls.' Resp. DSOF ¶¶ 25–26)). The evidence also shows that in 2014, Plaintiffs initiated an audit of Brothers because it may have a connection to a "newly discovered company, 'Carlson **Construction**,'" which is different than Carlson **Constructors**. R. 116 (Sealed), Pls.' Resp. DSOF ¶ 33 (citing R. 116 (Sealed) at 98). In 2014, Plaintiffs' auditor completed its audit of Constructors for the period of January 1, 2013 through June 30, 2014. *Id.* ¶ 34.

Given Plaintiffs' and their auditors' access to information, including the 2008 report showing many factors that establish a single-employer relationship, it is reasonable that Plaintiffs should have known as early as 2008 that a single-employer relationship existed between Brothers and Constructors. But simply knowing that Defendants constituted a single employer still would not have been a reasonable basis for Plaintiffs to bring suit at that time. In fact, the evidence establishes that Plaintiffs understood both Brother and Constructors to be bound to the Area Agreement at all times between 2001 and 2019, and that its internal records reflected that Brothers was not engaged in work within the Union's jurisdiction when it made audit requests in 2002 and 2008. *See* R. 116 (Sealed), Pls. Resp. DSOF ¶¶ 12, 22, 25, 27; R. 116 (Sealed), PSOAF ¶¶ 3–4.

In sum, based on the information possessed by Plaintiffs from 2008 through 2014 when they initiated the audit of all Defendants, there would have been no reasonable basis for Plaintiffs to bring suit on a single-employer theory or otherwise. Therefore, the Court rejects Defendants' laches argument and concludes that Defendant is not entitled to summary judgment on this defense.

## Conclusion

For the reasons given above, Plaintiffs' Motion for Summary Judgment [83] is granted. Defendants' Cross-Motion for Summary Judgment [101] is denied, although the Court finds that there are questions of material fact as to whether Plaintiffs are equitably estopped from enforcing the Brothers CBA. Defendants' Motion for Leave to File Supporting Documents under Seal [102] is granted.[16] The parties are directed to submit a status report by April 21, 2021 advising the Court on proposed next steps and advising whether the parties are amenable to a referral to the Magistrate Judge to conduct a settlement conference.

Dated: March 31, 2021

United States District Judge
Franklin U. Valderrama

---

[16]Defendants moved to file documents under seal in support of their Statement of Additional Facts under Local Rule 56.1(b)(3)(C). Before the Court could rule on the Motion for Leave to File under Seal (R. 102), Defendants filed their Local Rule 56.1(b)(3)(C) statement, with supporting documents, under seal (R. 108) (Sealed), DSOAF. The Court has considered the sealed documents when evaluating the parties' cross-motions for summary judgment. Still, to avoid confusion, the Court now grants the motion after the fact.